US Exhibit 43



Richard Lane, Richard Palmer, and Lea Sutherland-Doane, As Administrator of the Estate of David R. Southerland

V.

The United States of America, and Philip Powell and the

F/V Foxy Lady

Prepared by:

Thomas Ciarametaro

Five Fathoms Consulting LLC.

87 Dennison St

Gloucester, MA 01930

June 09, 2019

## Table of Contents:

I. Scope & Methodology
II. Documents Reviewed
III. Mr. Phillip Powell's Role and Responsibilities as Vessel Captain and the role played by the F/V Foxy Lady on 03DEC15
IV. Mr. Powell's Failures as Captain of the F/V Osprey on 03DEC15
V. United States Coast Guard Roles and Responsibilities.
VI. United States Coast Guard (SAR) response to F/V in distress Orin C
VII. Conclusion F/V Foxy Lady
VIII. Conclusion United States Coast Guard.
IX. Background and Resume.



( F/V FOXY LADY)



(F/V ORIN C)

I. **Scope and Methodology**

The Scope of this report was to gain an accurate picture of Captain Phillip Powell's roles, responsibilities and liabilities as captain of the F/V Foxy Lady on 03DEC15, as well as the roles, responsibilities and obligations of the United State Coast Guard on 03DEC15. In order to achieve this, I have conducted an investigation consisting of a wide range of documents, radio transmissions, written logs, photos, videos, official reports, witness interviews, and depositions. I Thomas Ciarametaro conducted the following to come to my conclusions.

- Full review of all documents, photographs, and videos pertaining to this incident.
- Compared the depositions and interview summaries to the USCG incident report, NTSB Incident report and audio/transcribed and written logs of the incident on 03DEC15, as well as best practices, common practices, and industry standards.
- Analyzed all scenarios and compared them to my training, experiences and industry standards.
- Analyzed the totality of circumstances.

II. **Documents Reviewed**

- Deposition of Brian Fleming
- Deposition of Doug Canney
- Deposition of Phillip Powell
- Deposition of Jesse Grissom
- Deposition of Richard Lane
- Deposition of Richard Palmer
- Deposition of Devin Smith
- Major Incident Investigation USCG (5830)
- National Transportation Safety Board (NTSB) Investigation Report.
- Plaintiffs Answers to Interrogatories.
- NTSB Interview Summary Richard Palmer -DCA16PM008
- Transmission Calls Transcribed
- US 000001 80 CDO Audio
- US 000081 91 OU Audio
- US 000093 111 SU Audio
- US 000092 Phone Patch USCG 47259 to Flight Surgeon
- US 0000112-130 USCG Orin C Safety Inspection / Exams.
- US 0000134 Cell Phone Video of Foxy Lady and Orin C
- Photos of Foxy Lady and Orin C
- US 0000135 Report of Autopsy Final Diagnoses Sutherland

- US 0000143 CG 47295 AIS data
- US 0000147 NOAA Buoy Data
- US 0000155-158 Radio Logs
- US 0000159-000174 VHF Ch 22 Audio
- US 0000175 HF Ch 16 Audio and Initial Call.
- US 0000176-189 VHF Ch CG 118 Audio
- US 0000190 Drug test form Palmer
- US 0000191 Massachusetts State Police Report
- US 0000197 USCG P6 Pump Logs
- US 000209 03DEC15 Radio Log
- US 000210-211 03DEC15 Radio Log
- US 0012-229 SAR Case Folder
- US 00230-233 CG Station Gloucester Boat Movement Record
- US 00234-238 CG Station Smooth Log
- US 000270-274 Investigator Interview Summaries
- US 000270-304 Cumberland Response
- US 000275-277 Investigator Statement Orin C crew interview summaries.
- US000305-332 Cumberland Response Pt. 2 Palmer Arrest State of Maine
- AST3 Vleck Interview
- BM1 Smith Interview
- BM2 Coughlin Interview
- BM2 Palelli Interview
- BOSN Lepere Interview
- BMC Clifford Interview
- CAPT Pennington Interview
- CDR Kelly Interview
- FN Tosh Interview
- MK1 Lehman Interview
- MK2 Adams Interview
- MK3 Anglebrandt Interview
- MK3 Wade Interview
- Mr. Fleming Interview
- Ms. Gustafson Interview
- OS1 Cook Interview
- OS2 Mauge-Chan Interview
- OS2 Page Interview
- OS3 Hennen Interview
- OS3 Wahlund Interview
- OSC Veda Interview
- LT. Garden Interview
- SN Hendrickson Interview

- US 000345-346 Sector Boston Chrono Log.
- US 000347 Comms Initial SAR
- US 00038-356 Medevac QRC
- US 000357-359 Sector Boston CC logs 03DEC15
- US 000360-363 Sector Boston CC Logs 04DEC15
- US 000382-399 Mishap Analysis Report
- US 00400-1297  USCG Boat Crew Seamanship Manual
- US 001298-1789 USCG Boat Ops and Training Manual Vol 1
- US 001790-2410 USCG Boat Ops and Training Manual Vol 2
- US 002411-3156 USCG SAR Addendum
- US 003157-3158 Flight Record 03DEC15
- US 003161 IMA Log
- US 003162 Radio Log 03DEC15
- US 003163-3164 Radio Log 03DEC15

### III. Captain Powells Responsibilities as Vessel Operator/Captain.

1. The responsibilities of any Captain of a vessel like F/V Foxy Lady are the safety of passengers and crew, as well as maintaining safe operations and navigation of the vessel. This includes, but is not limited to, all aspects of Fishing, towing, conducting drills and assisting other mariners.

2. Adhere to the USCG Navigation Rules (33 CFR 83)

### IV. Mr. Powell's Failures as Captain of the F/V Osprey on 03DEC15

1. Captain Powell is a professional mariner with over twenty years of experience and commercial vessel ownership. Captain Powell states throughout his deposition and interviews that he has experience on a variety of vessels and over the years and has rendered assistance to numerous vessels in distress, including at least four tows.

2. On 03DEC15, Captain Powell, while in command of the F/V Foxy Lady, answered a distress call from the F/V Orin C. Captain Powell answered the call and agreed to head east in the direction of the Orin C. and render assistance.

3. On 03DEC15, Captain Powell was aware of the weather conditions, as well as the forecasted weather conditions projected for that evening. Captain Powell testified that he left early for fishing on 03DEC15, because of the forecasted conditions and

even stated in his deposition (Pg. 113 Ln. 7-13) "They had hard nor 'west gusts to 40…" and went on to say, "It's not good. You get banged up. It's not good for the safety of myself and the crew." He also made clear that, "We left early because of the impeding weather."

4. Captain Powell Stated throughout his deposition that he had had many experiences towing vessels in the past. In Captain Powell's deposition (Pg. 41 Ln. 1-20 and again on Pg. 46-48) Captain Powell explains times where he towed vessels of similar size to the F/V Orin C., as well as vessels much bigger than the Orin C., both times using a tow line consisting of 300-400 feet.

5. Once Captain Powell arrived on scene to render assistance to the F/V Orin C at approximately 1200, Captain Powell and Captain Sutherland discussed a towing plan. Captain Powell proceeded to hook up tow to the F/V Orin C. with approximately 150-250 feet of tow line referred to by Captain Powell as "Big Stuff" and proceeded westerly inbound to Gloucester harbor. At the time seas were 3-5 Feet according to witness reports and weather buoys in close proximity with wind speeds approximately 15-20 knots NNW.



*( US 000207 Pics from Richard Palmer)*

6. Per Captain Powell's testimony (Pg. 126, Ln. 21), the tow line parted after "Five Minutes." Just five minutes after the initial tow, the line had parted for the first of three times during the remainder of an unsuccessful towing evolution. At this point,

red flags should have been going off that Captain Powell and the F/V Foxy Lady did not have the proper gear for the towing evolution. Not only did they not have enough length of line to engage in a proper tow, but the overall size and material of the line was not suitable for the sea and wind condition of 03DEC15.



*(Rope 1.jpg Rope used during the tow of the F/V Orin C)*



*(Rope 2.jpg Rope used during the tow of the F/V Orin C)*



*(Rope 1.jpg Rope used during the tow of the F/V Orin C)*

7. After the line was parted for the first time, Captain Powell re-established the tow with the F/V Orin C. and continued to head west for Gloucester Harbor. Captain Powell stated in his deposition (Pg.138 Ln.1-3) that it was approximately a half hour after re-establishing the tow from the initial parting of line that the line chaffed through and the tow line broke again. Meanwhile, the seas and winds were continuing to build and at-sea conditions continue to become worse. At this point, Captain Powell should have called off the evolution and radioed to Captain Sutherland that he his vessel and crew are no longer able to assist due to improper equipment and increasing weather. Although I believe Captain Powell's intentions were good, as a professional mariner, Captain Powell should have realized the risks associated with this towing evolution, as well as recognized the demeanor of the tow pertaining to the ride of the F/V Orin C and his inability to get both vessels in "STEP." This was primarily due to an inadequate length of towing line in relation to the weather conditions on 03DEC15, as well as the long duration of tow to get both vessels back to Gloucester harbor.

8. Industry Standard yield that a vessel being towed for a long duration or distance, even in calm seas, should be 8 to 10 times the length of the vessel being towed. For example, a vessel 50 ft in length should be towed with a line at least 450-500 ft. This amount of line is to ensure that the vessels are able to come into "step." As an example, vessels in "step" would both enter the trough of a wave and rise to the crest of a wave at the same time in unison. If the vessel being towed enters the trough of a wave and the vessel engaged in towing enters the crest of a wave, a reaction called "shock loading" will take effect. "Shock loading" can cause severe damage to both vessels, especially the one being towed. Shock loading can even result in one or both boats capsizing. This is one of many reasons that a proper tow line is required for

towing evolutions like the one on 03DEC15. Below is an example of out of step vessels shock loading a line in heavy seas.

**(Note)** *At this point, the tow line has parted twice, and the length of tow line has decreased to less than 100 ft from an estimated starting point of 200 ft. (Captain Powell's deposition Pg. 131 Ln. 14 -24; Mr. Palmer is questioned in his deposition Pg. 302 Ln 1-25 and states that the rope was 150-200 feet or shorter)*



*(US000208 Pics from Richard Palmer)*

**(Note)** *The Line shown above connected to the F/V Orin C. bow cleat appears to be different than the photos of line provided by the F/V Foxy Lady and the United States. This line appears to be three strand and the color yellow. Both photos of line referenced earlier in the report are blue and white in color. The Blue line is double braded nylon, and the white line is three strand.*

8.(B) Towline length will vary in most every towing evolution. In all of my personal experiences towing vessels in seas less than 1 ft to seas 25-30 ft, one factor always remains the same. The harsher the weather the more tow line needed. Towline length serves yet another purpose. The longer the towline, the more "Catenary" the line has. Catenary is the dip in the line, or the "U" shaped portion in the middle of both connection points. In certain cases, the catenary of the line or weight of the line, chain or cable is actually assisting in the tow and used as a shock absorber.



*(Visual Image Google Images USCG AUX 1)*

9. As you can see from the above images and statement compared to the events on December 3rd, 2015 Captain Powell did not possess the correct equipment to engaged in the towing of the F/V Foxy lady. Fundamentally, everything about the tow and the conditions was improper from the start.

10. Continuing with the tow, after parting the tow line for the second time, Captain Powell and the F/V Foxy Lady had reestablished tow for a third time. At approximately 1449, the F/V Foxy Lady radioed USCG Sector Boston alerting them that a large wave had broken the pilothouse windows and ripped off part of the roof structure. *(Major Incident Investigation USCG) (MII)*. In addition, Mr. Grissom a crewman on the F/V Foxy Lady stated in his deposition (Pg. 75 Ln. 15-22) *"That big wave, I was sitting on the cooler looking out the back of the boat, just watching the tow, and we had this wave come and his boat just disappeared, the wave in between us. And he just punched right though that wave and I watched the roof peel back. And then the line broke and then he was laying there with his roof peeled back."* I have learned through the documents referenced above that a "rogue" wave had struck the F/V Orin C. and it is apparent that the F/V Foxy Lady towed the F/V Orin C. straight through a wave causing irreversible damage to the F/V Orin C. This would be the beginning of the end for the F/V Orin C. with respect to the structural integrity of her wooden hull. In the deposition of Mr. Richard Lane, Mr. Lane is quoted saying (Pg.83 Ln2-19) *"I mean it was a pretty rough tow. We were getting you, like I mentioned before, the line was really short, so it was kind of beating us up, beating the boat up. It was dragging us through the waves. We were you know, we had parted the line three or four times. Every time the line parted, I'd climb back*

> up, they'd come back throw it to us again. You Know, it was getting shorter and shorter with each break. And I mean that's what went on until we took the big wave still under tow. Took it. They just went, boom, pulled us through this big one, and it was just water—all water just went, and through the middle of this wave, and smashed the windows, ripped the roof off, and, you know, filled us with water."

After the big wave incident, Captain Powell and Captain Sutherland decided to discontinue the tow and only help keep the F/V Orin C into the waves, so it was not laying beam to the seas. F/V Orin C began dewatering operations using in house pumps in an attempt to keep the vessel seaworthy and afloat.

11. It is my experiences that older wooden hulls like the F/V Orin C are much more susceptible to damage from towing and extra caution must be taken when towing or conducting any type of marine assistance. In this case, the proper length of tow line and seamanship would have given the F/V Foxy Lady and F/V Orin C a much higher success rate.

## V. United States Coast Guard Roles and Responsibilities.

1. The United State Coast Guard (USCG) is the nation's oldest continuous sea going service. The USCG is a Multi Missioned Force. The USCG performs 11 official missions including Port and Waterway Security, Drug Interdiction, Aids to Navigation, Search and Rescue (SAR), Living Marine Resources, Marine Safety, Defense Readiness, Migrant Interdiction, Marine Environmental Protection, Ice Operation, and Federal Law Enforcement under (14USC98)

2. Search and rescue (SAR) are one of the Coast Guard's oldest missions. Warding off the loss of life, personal injury, and property damage by helping boaters in distress has always been a top Coast Guard priority. Coast Guard SAR response involves multi-mission stations, cutters, aircraft, and boats linked by communications networks. The Coast Guard is recognized as a leader in the field of search and rescue. To meet this responsibility, the Coast Guard maintains SAR facilities on the East, West, and Gulf coasts, as well as in Alaska, Hawaii, Guam, and Puerto Rico, and on the Great Lakes and inland waterways.

**(Referenced)** *http://www.gocoastguard.com/about-the-coast-guard/discover-our-roles-missions*

## VI. United States Coast Guard SAR response to F/V in distress Orin C 03Dec15

1. On 03DEC15 USCG Sector Boston received a radio call from the F/V Foxy Lady requesting permission to cross through a closed fishing area in order to render assistance to the F/V Orin C. at approximately 0917.

2. At this time the USCG became first aware that the F/V Orin C. had a mechanical failure. In the deposition of Mr. Brian Fleming a question was asked in regards to operational status of the F/V Orin C. (Pg. 77 Ln.7-16):

   *Q- All right. So, when a Coast Guard over the radio, someone from either of the Station Gloucester or Boston or the command says, 'The Vessel's dead in the water' Can you explain what that could mean?*

   *A- It means they're not under power and drifting. It may be voluntary, they shut their engines off. I'm DIW just to let you know or it may be something where there's a casualty that means they don't have their propulsion or they don't have their steering. So, they'll say, 'I'm DIW or 'I'm dead in the water.'*

   *Q- Would the Orin C have qualified to be dead in the water under the terminology that we just discussed in this situation?*

   *A. He shut the engine off so yes.*

3. Mr. Fleming assumed watch of the Operational Unit (OU). Mr. Fleming stated in his deposition, that he was aware that severe weather was coming that day 03DEC15 (Pg. 67 Ln. 7-16):

   *Q. You knew weather was coming, right?*

   *A. Yes.*

   *Q. And you knew gale force winds were on as of that afternoon?*

   *A. Yes.*

   *Q. Okay at this point, did you consider launching an asset of the Coast Guard to monitor or assist?*

   *A.   Yes.*

   *Q.   Ok, and did you do so?*

   *A.   No.*

4. Shortly after the F/V, Foxy Lady arrived on scene with the F/V Orin C. they alerted USCG Sector Boston. Operations Specialist Third Class (OS3) Andrew Wahlund was the

Communications Unit Controller at the time of incident. Then they began towing the F/V Orin C. Within a few minutes of the tow, the line had parted for the first time. In an internal interview conducted by the USCG, OS3 Wahlund stated that the F/V Foxy Lady found it difficult to tow the F/V Orin C. He also states that he overheard radio communication between both vessels that they were having problems with avoiding large waves and worsening weather. In addition, OS3 Wahlund stated he heard radio communication between both vessels alerting when "big waves" were coming.

5. At this point, OS3 Wahlund should have passed to the OU that both vessels were having a hard time maintaining a tow and the Command Center, as a whole, should have re-evaluated sending a USCG asset to assist. Members from the Command Center state in a series of different interviews, depositions and radio transmissions that they were well aware of the gale force warnings in effect. At this time, I would also like to point out that OS3 Wahlund stated in his Official USCG internal interview (Exhibit 3.0 Pg.2) dated 18DEC15 that "*he felt that the Coast Guard should have gotten an asset underway earlier based on weather forecast.*" Although neither vessel F/V Foxy Lady or the F/V Orin C formally requested for USCG assistance, the Command Center never radioed out asking if they needed them to come and assist. It is apparent that the Command Center was aware of the dangerous situation and needs no formal request to intervene.

6. Approximately 1450 on 03DEC15 the USCG Sector Boston Command Center was alerted that a "Rogue Wave" has struck the F/V Orin C. causing severe damage to the roof of the pilot house and other unknown damage throughout the vessels old wooden hull. At this time, the USCG Sector Boston Command Center, finally decided to launch a asset identified through the documents reviewed as the CG 47259, homeported at USCG Station Gloucester, 17 Harbor loop Gloucester MA.

   At this point, seas had built to 10-12 ft seas, winds 25-30 plus knots. In addition, the Command Center, as well as USCG Air Station Cape Cod, should have had a Helicopter (Helo) on deployment to assist the F/V Orin C. From the deposition of Brian Fleming (Pg. 141, Ln. 10-13):

   > "**When you have a vessel that's taking on water** or you have a report of a person who's already in the water, **we always send a helo** because they rescue the people in the water."

   From the moment the "rogue wave" hit the F/V Orin C. they were taking on water. It is apparent throughout this incident from my investigation, that from the initial consideration of launching a Helo, starting at the Command Center, to the Air Station, as well as USCG District 1, that there was some confusion on timing and overall decision making regarding the deployment of a Helicopter to render assistance, in the rescue efforts of the crew of the F/V Orin C.

   From the radio transmissions, 0000034, Commander Kelly, conversing with Boston asked:

Commander Kelly: *"All right, where's the helicopter?"*

Coast Guard Boston: *"The helicopter is – we're still waiting for the helicopter."*

Commander Kelly: *"All right. Well, I thought that's why we called them to put them on a short leash."*

From the context of this exchange, it is obvious that Commander Kelly agrees that the helo should have been on scene already. And Mr. Fleming is correct, when a report of a vessel taking on water especially in these conditions comes in, the helo should launch right away.



*(USCG 47259 Located at USCG Station Gloucester)*

7. At this point, the conditions become such that a rescue missions' chances of success had been severely diminished from the original call. Not only has the sea state dramatically changed for the worse, the crew of the CG 47259 now had sunset approaching by the time they would arrive on scene, making every aspect of this search and rescue mission much more complicated in the dark of winter. If the CG 47259 had launched hours prior, I believe the overall towing and rescue mission would have had a much higher success rate, and the F/V Orin C would not have been so severely damaged under tow by the F/V Foxy Lady and ultimately sunk on 03DEC15.

8. Upon Arriving on scene with the F/V Orin C. and the F/V Foxy Lady, the crew of the CG 47269 began rescue efforts. At this time the F/V Orin C. reported a lot of water inside the engine compartment, so the crew of the CG 47259 decided that a dewatering pump was necessary aboard the F/V Orin C. The CG 47259 is equipped with a "P6 Pump"

capable of pumping 250 gallons per minute. In my experiences using, maintaining, and training with the P6 pump, it was always hit or miss. As far as the engine is concerned, the P6 has an extremely reliable Honda motor that always seems to start with little effort. However, the pumping and priming mechanism is known for its unreliability. In fact, Brian Fleming confirmed in his deposition that he stated: *"I had trouble starting those fucking things."* (Pg.169 Ln.11), referring to the P6 pump in radio transmission 000089. This is further proof that it is well known throughout the USCG that these pumps are notorious for having issues. Again, this was the only pump available as the helo had still not been dispatched.

9. CG 47259, due to heavy and increasing seas were, unable to pass the pump directly over to the F/V Orin C. They had to use an "indirect method." An Indirect method is using heaving lines, attaching the pump can onto the line and passing it over to the F/V Orin C. In my extensive training and experience you only use this method in heavy weather when it is not feasible or too unsafe to pull up directly next to a vessel. After the pump was onboard the crew of the F/V Orin C. were able to start the pump and gain suction pumping most of the water out of the engine room compartment. Shortly after the pump lost suction and the crew was instructed to clear the strainer portion of the pump out. It is referenced in reports, depositions and radio logs that rags had blocked the suction hose end of the pump – but none of the crew of the F/V Orin C. confirmed that assessment. Upon clearing the suction hose, the crew of the F/V Orin C. were never able to regain suction rendering the pump inoperable. The CG 47259 then began the process of towing the F/V Orin C. using a tow line of approximately 800ft per the deposition of the Coxswain in charge of the CG 47259, Boatswains Mate First Class ( BM1) Devin Smith (Pg. 67 Ln. 1): "Much as we could, which was about 800 feet."

   *NOTE: (This helps further prove the theory that the tow line originally used to tow the F/V Orin C by the F/V Foxy Lady was much too short for the conditions on 03DEC15. The Coxswain had to use a scope of 800 feet to get the vessels in step and rig a proper and safe tow.)*

10. Due to an inoperable P6 Pump, increasing seas and winds the severely damaged F/V Orin C. began to sink. The CG 47259 was forced to cut its own tow line and instruct the Captain and crew of the F/V Orin C to dawn their survival suits and systematically enter the water one at a time. Again, just like the scenario of an indirect passing of the P6 pump, the on-scene weather conditions made it impossible to come alongside the already sinking F/V Orin C. and disembark the crew onto the CG 47259. The CG 47259 was able to recover two crewmembers (referred to as survivors). Witness reports state that the Captain, Mr. Sutherland entered the water, took a couple of swim strokes, and stopped moving altogether. Mr. Sutherland's unconscious body was ultimately picked up (again indirectly) by a surface swimmer deployed from the CG 47269. Once Mr. Sutherland was recovered from the water the crew of the CG 47269 began CPR, first under the instruction of BM1 Smith and continued under the direction of a Flight Surgeon, (Identified from his CG interview summary as CAPT Pennington). During this evolution

a Coast Guard Helicopter (Rescue6030) arrived on scene at approximately 2107 (At the request of Coxswain BM1 Smith) and was ultimately unable to lower the rescue swimmer whom was a certified Emergency Medical Technician (EMT) equipped with an Automated external defibrillator (AED), due to the severe weather conditions. Ultimately the CG 47259 returned to Gloucester at approximately 2230 where the body of Mr. Southerland was transferred to county emergency medical services and was pronounced dead.

### VII.  Conclusion F/V Foxy Lady

1. F/V Foxy Lady rendered assistance to the F/V Orin C. under the direct control of Captain Phillip Powell.  Captain Powell engaged in a towing evolution that he was not properly prepared for, and should have stated to the Captain of the F/V Orin C. that the seas state and incoming weather, as well as the improper scope and size of tow line he had on board, would not suffice for a proper and safe tow, especially reiterating this after the first time the tow line parted. Captain Powell should have notified USCG Sector Boston Command Center and asked for Coast Guard assistance. Throughout this thorough investigation, it is apparent to me that the towing of the F/V Orin C. with the improper towline and equipment did irreversible damage to the wooden-hulled F/V Orin C, and I believe the damage sustained to the F/V Orin C. from the improper tow was a substantial contributor to its eventual sinking on 03DEC15.

### VIII.  Conclusion Assistance by United State Coast Guard.

1. The United State Coast Guards role during the search and rescue case of the F/V Orin C. on 03DEC15 was an incredibly complex set of events. Although, in my investigation, I have found no violations of internal policy by any of the members or entities of the United States Coast Guard (except that the helo should have been launched upon first notice of the vessel taking on water), I believe that an earlier response would have significantly changed the entire outcome of the events on 03DEC15. Due to the sea state, on scene weather, air/water temperatures and darkness there is no doubt that if a Coast Guard asset or assets had been launched earlier in the day that there would have been more options available for assisting the F/V Orin C.  I believe the totality of the circumstances warranted Coast Guard assistance much earlier on, before the weather and events around the F/V Orin C. were at extremis. I have also found throughout this investigation that a significant breakdown in communication from the watch stander, to the OU, and up and down the chain of command was present.  It is my experience that policy and formalities pertaining to Coast Guard assets responding to search and rescue cases or law enforcement missions often have some kind of communication breakdown in the chain of command, regarding decision making, particularly when to involve assets or when release assets from a scene or case.

*Disclaimer: I, Thomas Ciarametaro of Five Fathoms Consulting LLC. reserve the right to amend my report if new information/evidence becomes available pertaining to any aspect of this case or the contents within this document.*

Thomas P. Ciarametaro Jr

Five Fathoms Consulting, LLC.

### IX.  Background and resume.

My Name is Thomas P. Ciarametaro Jr. I am an 11-year USCG active duty veteran. I hold a 100 G.T Masters US Merchant Marine license. In addition to my military time, I hold other various certifications including DWO USCG Navigation rules of the road, Massachusetts Certified Harbormaster, and I am a graduate of the Federal Law Enforcement Academy in Charleston, South Carolina (Maritime Law Enforcement Academy).

I currently serve as the Harbormaster for the City of Gloucester, MA, where I work closely with many port partners including the Army Corps of Engineers, Massachusetts Environmental Police, State and Local Police, United States Coast Guard, Massachusetts Department of Environmental Protection, as well as State and Federal elected representatives. I control a department of 17 employees as well as a fleet of six vessels consisting of two law enforcement and search and rescue patrol craft. I also continue to serve in the USCG Reserves where I act as a Federal Officer, Coxswain, and search and rescue operator. In addition, I am the Owner of Five Fathoms Consulting LLC, where I work as an expert witness for maritime-related cases, as well as consult for various maritime stakeholders and companies.

**I have been involved in some capacity as an expert in the following cases:**

1. Commonwealth v. Urbelis, (SSC, 2016) USCG Federal Officer
2. United States v. F/V Princess Laura Anthony & Enzo, Inc. (USDC, 2011) USCG Federal Officer
3. Sally Olsen and Mark Olsen v. Peter Mullen, Irish Venture Inc, and F/V Osprey (Expert Witness)
4. Matthew Holland v. Garrett Lee Saunders. New York Supreme Court (ID# 20163109) (Expert Witness)

Date: 11JUN19

Thomas P. Ciarametaro Jr

*Thomas P Ciarametaro*