**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |
| RICHARD LANE, RICHARD PALMER,  ) | |
| And LEA SUTHERLAND-DOANE as  ) | |
| ADMIN. ESTATE OF DAVID SUTHERLAND, ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | Civil Action |
| v.  ) | No. 17-12356-PBS |
| ) | |
| UNITED STATES OF AMERICA,  ) | |
| PHILIP POWELL, and F/V FOXY LADY, ) | |
| ) | |
| Defendants.  ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | |

**MEMORANDUM AND ORDER**

March 24, 2020

Saris, D.J.

**INTRODUCTION**

Plaintiffs bring this action claiming that Defendants negligently caused the sinking of the Orin C, a fishing vessel that was stranded at sea after its engine oil became contaminated. The Orin C's crewmembers, including the estate of the deceased captain, sued the Foxy Lady, its captain Philip Powell, and the United States Coast Guard.

After hearing, the Court **ALLOWS** the United States' motion to dismiss based on sovereign immunity (Dkt. No. 88) and **DENIES** the motion by Powell and the Foxy Lady for summary judgment (Dkt. No. 85) because there are disputed issues of fact as to

1

whether those Defendants are protected by the Good Samaritan
Doctrine.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise
indicated.

### I.   Foxy Lady's Tow of the Orin C

On December 1, 2015, the fishing vessel Orin C, a 51-foot
converted lobster boat, left port in Gloucester for a fishing
expedition with plans to return two days later, on December 3.
The Orin C was owned and captained by David Sutherland and had
two crewmembers on board, plaintiffs Richard Palmer and Richard
Lane, known as Travis Lane.

On the morning of December 3, Sutherland detected an issue
with the Orin C's engine. The crew concluded that water had
mixed with the engine oil, and that the Orin C did not have
enough spare oil to replace the contaminated batch. Sutherland
and the crew feared the engine would be further damaged if they
attempted to run it on contaminated oil. The Orin C was, in
seaman's terms, "dead in the water." Dkt. 88-5 at 3.

The crew did not call the Coast Guard, because they
believed the Coast Guard would only come if they were in life-
threatening danger. They also did not call a commercial tow
company because, in Lane's words, "[It's] like a myth. Nobody
ever calls a commercial tow company." Dkt. 88-3 at 42. Instead,

as is customary in the industry, they reached out for assistance from another commercial fishing boat. With no other vessels within radio range, the Orin C called the Foxy Lady, a 45-foot fishing vessel, for help. The Foxy Lady agreed to tow the stranded vessel back to Gloucester.

To assist the Orin C, the Foxy Lady had to cross controlled fishing grounds at a slow pace. Not wanting to raise concerns that he was illegally fishing, at 9:17 AM, Foxy Lady's captain Powell alerted the Coast Guard of his plans to tow the Orin C. Powell was given approval to cross the area and set course. Though the conditions were relatively clear at that time, gale warnings were predicted for later that day.

After receiving the Foxy Lady's call, and with Powell's assistance, the Coast Guard contacted the Orin C directly at 9:26 AM. The Orin C relayed its vessel description, location, number of persons on board, nature of its emergency, and whether the crew was wearing lifejackets. During their conversation, Sutherland did not ask for the Coast Guard's assistance. The Coast Guard classified the Orin C as "disabled" and not "in distress." Dkt. 88-5 at 3. The Coast Guard placed the Orin C on a communications schedule of thirty-minute intervals, so that it could continue to monitor the situation until the Foxy Lady arrived. During one such communication at 10:49 AM, Sutherland reported that "everything in the boat is good." Id. at 7.

The Foxy Lady reached the Orin C at approximately 11:15 AM, about two hours after it had set course. The Coast Guard altered its communications schedule to an hourly timetable. These contacts would be made with the Foxy Lady. The Coast Guard spoke with the Foxy Lady three times between 11:26 AM and 2:23 PM. Each time, the Foxy Lady reported that the vessels were progressing towards Gloucester.

To set up the tow, the Foxy Lady used its own rope, estimated by Powell to be about 300 feet long at the start of the tow. About five minutes into the tow, the rope broke. According to Powell, the rope had chaffed on a piece of exposed metal on the Orin C's bow. The crew reconnected the tow and continued for another 30 minutes, when the rope broke again. The crew on the Orin C fashioned an anti-chaffing barrier using rubber tubing and again reconnected the rope. The tow continued for several hours, until the line broke on the Foxy Lady's side. The crew reconnected the line again.

The parties dispute whether, during the tow, the vessels were "in step." Vessels are "in step" if "the towing vessel [is] cresting away at the same time as the vessel being towed," meaning the two boats reach the crests and troughs of parallel waves in tandem. Dkt No. 86-28 at 2. According to the testimony of a Coast Guard member, being "in step" is important because "if the vessel is not in step . . . you could pull a vessel into

the face of a wave and just [exacerbate] the strength of the wave." Dkt. 88-10 at 9. Powell claims the vessels were in step at least after the second break in the line. Plaintiffs say "[t]he vessels were never in step." Dkt. 104-8 at 4.

At about 2:47 PM, the line broke a fourth time. Everyone agrees that the final break was the result of a "rogue wave."[1] The wave punched in two windows in the Orin C's pilot house and peeled back a section of its roof, allowing water to enter. The crew of the Orin C was able to close the windows and pump out the water that had entered through the windows and roof. However, once the water was pumped out, it began to rise again. According to Lane, the crew "determined . . . that [the] wave also damaged the . . . boat, the hull." Dkt. 104-2 at 7. Powell disputes that structural damage occurred at this point.

## II.  Deployment of Coast Guard Assets

At 2:49 PM, the Foxy Lady informed the Coast Guard about the wave and the damage to the Orin C's roof. The Foxy Lady then told the Orin C it intended to reconnect the line and the Orin C replied, "[I] think we just gotta [sic] be takin' water." Dkt. 88-5 at 10. The Foxy Lady responded, "[I] don't want you to keep you drifting out to sea, so what I want to do is keep a light, light tow, just nice and easy and I'll just do the best I can."

---

[1] Although there is a nautical definition of a "rogue wave," the term here refers more colloquially to an unusually large wave.

Id. at 11. The Orin C responded, "[A]ll right man. Sorry I just uh don't know you know." Id.

At 3:02 PM, the Coast Guard informed the Foxy Lady that it was deploying a Coast Guard asset to assist. A 47-foot motor lifeboat, CG 47259, launched from Gloucester at about 3:30 PM with an approximated travel time of 1.5 hours. While the Coast Guard crew sped toward the two vessels, the Coast Guard shifted its communications schedule back to every thirty minutes. During this period, the Foxy Lady towed the Orin C into the oncoming waves and wind to keep the damaged vessel in place until the Coast Guard's arrival. The Orin C continued to pump water from the engine room but reported to the Foxy Lady that one of its pumps had failed and another was "on and off." Id. at 18.

At 4:55 PM, the Coast Guard rescue team reached the two vessels. The rescue team was told by Boston Sector Command that the Orin C had taken on water during "the encounter with the rogue wave," but that it was no longer taking on water. Dkt. 86-8 at 2. The Coast Guard officer in charge of the scene testified that based on their "observations of the Orin C upon arriving on scene and in the early stages of the tow . . . there was no indication that the vessel had any sort of water that was onboard." Id. at 8. The rescue team decided to send a pump over to the Orin C to clear the engine room of any remaining water.

Once the crew removed the water, the Coast Guard would take over the Orin C's tow from the Foxy Lady.

At 5:17 PM, the Coast Guard successfully delivered the pump to the Orin C. The Orin C initially reported the pump was not functioning. But by 5:48 PM, the Orin C informed the Coast Guard that the pump was working and water levels were decreasing. At that point, the Coast Guard attempted to persuade Sutherland to send a crewmember to the bow of the Orin C to release the Foxy Lady's tow line and replace it with the Coast Guard's. Sutherland was reluctant due to the severe weather conditions. The Foxy Lady urged Sutherland to replace the tow, saying "the rope we're [using] right now is too small. [T]hey gotta put the big rope on there. This . . . this is like kite string we're on right now." Dkt. 88-5 at 25. A few minutes later, Sutherland agreed.

At 6:07 PM the Coast Guard replaced the Foxy Lady and initiated a tow using 800 feet of towline. The Coast Guard instructed the Foxy Lady to return home and asked the Orin C to contact them if they experienced any medical emergencies or if they started taking on water. Over the next half hour, the only status report the Orin C provided was that the ride was "cold." Id. at 27-29.

At 6:43 PM, Sutherland reported the pump was no longer working. The Coast Guard attempted to troubleshoot over the

radio. At 7:13 PM, the Orin C reported rising water levels in
its engine room. Sutherland said he thought the water was
"comin' up through the deck." Id. at 32. The Coast Guard
suggested that the crew bail water out using buckets while the
Coast Guard towed the Orin C to calmer waters, where a Coast
Guard engineer could board the vessel and try to fix the pump.

At 7:41 PM, Sutherland reported that water levels were
still increasing. The Coast Guard asked Sutherland whether he
thought the Orin C was unsafe, to which Sutherland responded
"no." Id. at 36. The Coast Guard said that the crew was its
primary concern, not the boat, and, if necessary, it would break
the tow and recover those onboard. At 7:55 PM, Sutherland said
that if he were more concerned, he would get off the boat. The
Coast Guard stated to Sutherland in no uncertain terms: "I don't
want a last second thing here where you three guys, uh, jump in
and we're still towin' you." Id. at 37.

### III. **Sinking of the Orin C**

A few minutes later, Sutherland's tone changed. One of the
crewmembers, Palmer, had been sitting in his bunk to stay dry
and, when he got out, he realized the water had risen halfway up
to his knee. At 7:59 PM, Sutherland told the Coast Guard that he
was "gettin' a little nervous" and thought they were "gonna go
down." Dkt. 88-5 at 37. The rescue team believed the severe
conditions made it too dangerous to attempt a rescue by pulling

alongside the Orin C and instead decided to conduct a "water recovery." The Coast Guard instructed Sutherland that this would require his crew to enter the water one at a time wearing immersion suits. Coast Guard members would then recover each crew member.

Conditions aboard the Orin C rapidly deteriorated in the thirteen-minute gap between when the Coast Guard made this order and when the Orin C's crew was ready to enter the water. The Coast Guard directed the first crewmember to enter the water and, at 8:15 PM, Palmer was successfully recovered by the Coast Guard. By that time, water was flooding the entire stern of the Orin C and it was beginning to sink. The second crewmember, Lane, then "jumped" into the water and swam toward the Coast Guard vessel, where he was hoisted on board. Dkt. 88-10 at 37. At the same time, the Coast Guard observed Sutherland swim briefly away from them before going limp and repeatedly submerging. At 8:18 PM, the Orin C sank, leaving a debris field between the Coast Guard vessel and Sutherland.

The Coast Guard deployed a surface swimmer to retrieve Sutherland. When he was brought on board at 8:22 PM, Sutherland was no longer breathing and lacked a pulse. The Coast Guard began cardiopulmonary respiration ("CPR"). At 8:34 PM, it requested a helicopter deployment to medevac Sutherland. The Coast Guard performed CPR from 8:30 PM until the helicopter

arrived at 9:11 PM. Given the severe weather conditions, attempts to lower a rescuer from the helicopter to hoist Sutherland up were unsuccessful. The Coast Guard crew continued to perform CPR until instructed to stop by the commanding officer of the Gloucester outpost at 9:31 PM. At 10:25 PM, the Coast Guard vessel docked in Gloucester, where Sutherland was pronounced dead.

### IV. **Summary Timeline of Events of December 3, 2015**

| 9:17 AM | Powell informs Coast Guard that he intends to tow Orin C. The Coast Guard classifies Orin C as "disabled" but not "in distress." |
| --- | --- |
| 11:15 AM | Foxy Lady arrives at Orin C's location. Over the next 2.5 hours, the towline breaks two or three times. |
| 2:47 PM | A rogue wave hits Orin C. |
| 2:49 PM | Foxy Lady informs Coast Guard about the wave. |
| 3:02 PM | Coast Guard informs Foxy Lady that it is deploying CG 47259 (motor boat). |
| 3:30 PM | CG 47259 departs from Gloucester. |
| 4:55 PM | CG 47259 arrives at location of Foxy Lady and Orin C. |
| 6:07 PM | CG 47259 replaces Foxy Lady. Foxy Lady departs. |
| 6:34 PM | Sutherland (Orin C) reports pump is not working and water level in engine room is rising. |
| 7:59 PM | Sutherland reports he thinks they are sinking. |
| 8:15 PM | Palmer swims from Orin C to CG 47259. |
| 8:18 PM | Orin C sinks. Sutherland and Lane are in the water. |
| 8:22 PM | Sutherland brought on board by rescue swimmer with no pulse. Coast Guard initiates CPR. |
| 8:35 PM | Medevac helicopter departs from Hyannis. |
| 9:11 PM | Medevac helicopter attempts to evacuate Sutherland but cannot due to weather conditions. |
| 10:25 PM | CG 47259 docks in Gloucester. |

## UNITED STATES' MOTION TO DISMISS

### I. Standard of Review under Rule 12(b)(1)

The United States has moved under Rule 12(b)(1) to dismiss all claims for lack of subject matter jurisdiction based on sovereign immunity. "[W]hen a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) involves factual questions," the court's standard of review depends on "whether the relevant facts, which would determine the court's jurisdiction, also implicate elements of the plaintiff's cause of action." Torres-Negron v. J & N Records, LLC, 504 F.3d 151, 162-63 (1st Cir. 2007) (citation omitted).

Where "the jurisdictional issue and substantive claims are so intertwined" that "resolution of the jurisdictional question is dependent on factual issues going to the merits," the court applies a summary judgment standard. Id. at 163 (quoting Autery v. United States, 424 F.3d 944, 956 (9th Cir. 2005)). By contrast, "if the facts relevant to the jurisdictional inquiry are not intertwined with the merits of the plaintiff's claim," then the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). Because the jurisdictional issue and substantive claims are intertwined here, the Court will apply the summary judgment standard.

## II.   Standard of Review Under Rule 56

A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (citation omitted). "A genuine issue exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party." Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

## III. Sovereign Immunity and Discretionary Function Exception

The United States, in its sovereign capacity, is immune from suit except when it consents to be sued. Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 253 (1st Cir. 2003). "[T]he terms of its consent define the federal courts' jurisdiction over suits against the United States." Id.

Plaintiffs bring claims under the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101-13, and the Suits in Admiralty Act ("SAA"), 46 U.S.C. §§ 30901-18. Both statutes include waivers of the United States' sovereign immunity. The PVA allows recovery against the United States for "damages caused by a public vessel of the United States," including by its crew. 46 U.S.C.

§ 31102(a)(1). The SAA waives sovereign immunity in cases where
if the public vessel "were privately owned or operated . . . or
if a private person or property were involved, a civil action in
admiralty could be maintained." 46 U.S.C. § 30903.

The PVA may not apply to the extent Plaintiffs challenge
decisions made by land-based Coast Guard employees, rather than
actions taken by crew in the middle of a rescue. See Uralde v.
United States, 614 F.3d 1282, 1286 (11th Cir. 2010) ("[W]hen
Coast Guard personnel are negligent in performing functions
other than those 'in the operation of' public vessels, the
claims arising from those acts fall under the SAA, rather than
the PVA."); Taghadomi v. United States, 401 F.3d 1080, 1088 n.5
(9th Cir. 2005) ("It is possible that the negligent-search claim
falls outside the PVA to the extent that it involves the
negligence of officials in the Coast Guard office on land rather
than the crew of the [Coast Guard vessel].").

In any case, both statutes are subject to the same implied
"discretionary function exception." Thames Shipyard, 350 F.3d at
254. Under that exception, the United States does not waive its
sovereign immunity "if the action challenged in the case
involves the permissible exercise of policy judgment." Id.
(quoting Berkovitz v. United States, 486 U.S. 531, 537 (1988)).
The exception is intended to "prevent judicial second-guessing
of legislative and administrative decisions grounded in social,

economic, and political policy through the medium of an action in tort[.]" Berkovitz, 486 U.S. 536-37 (quotation omitted).

The discretionary function analysis is two-part. Id. at 536. At the first step, the court must determine whether the challenged act is "discretionary." Id. "Discretionary conduct is not confined to the policy or planning level." United States v. Gaubert, 499 U.S. 315, 327 (1991). Instead, the operative question is whether the challenged action involves "an element of judgment or choice." Berkovitz, 486 U.S. at 536. If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the conduct is considered mandatory. Id. In that case, the court's analysis ends at step one and the discretionary function exception does not apply. However, if the act is discretionary, the court proceeds to step two.

At the second step, the court determines whether the challenged act "is of the kind that the discretionary function exception was designed to shield," meaning it is "based on considerations of public policy." Id. at 536-37. Acts based on "purely technical or scientific considerations" or that involve only "ordinary professional judgments" are not immunized by the discretionary function exception. Thames Shipyard, 350 F.3d at 256, 260. However, even decisions made at an "operational level" can be based on policy. Gaubert, 499 U.S. at 332 (recognizing

that day-to-day operational decisions undertaken "for policy reasons of primary concern to the regulatory agencies" fall within the exemption).

The two steps of the discretionary function analysis are often linked. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Id. at 324.

## IV.  **Analysis**

Plaintiffs argue[2] that the Coast Guard erred by determining that the Orin C was not "in distress" and by failing to initiate its rescue sooner. Plaintiffs also contend that the Coast Guard should have launched its helicopter earlier to recover the Orin C's crew. They argue that neither of these alleged breaches falls within the discretionary function exception, while the United States argues that both do.

### 1. **Delayed Rescue Efforts Based on Distress Determination**

Plaintiffs argue they prevail at the first step of the discretionary function analysis because the Coast Guard was under a specific mandate to initiate a rescue much earlier than

---

[2] Though Plaintiffs' complaint alleged five separate breaches of duty, Dkt. 1 ¶ 52, their opposition to the United States' motion to dismiss presses only two.

it did, specifically when it learned the Orin C was "dead in the water." Plaintiffs rely on the "distress factors" in the Coast Guard Addendum to the United States National Search and Rescue Supplement to the International Aeronautical and Maritime Search and Rescue Manual ("SAR Addendum"). The factors include, among others, the size of the vessel, medical conditions on board, the ability to communicate with the vessel, impending weather, where the vessel is located, and the assessment of the captain.

Although one of the Coast Guard's statutory missions is to provide rescue services to mariners in distress, it has "no duty to provide rescue services on demand." Thames Shipyard, 350 F.3d at 256. In determining whether to initiate a rescue, the Coast Guard looks to the SAR Addendum for guidance. But this policy guidance is not binding on the Coast Guard. See In re American Oil Co., 417 F.2d 164, 170 (5th Cir. 1969) ("The SAR Plan imposes no extra statutory pre-existing legal duty on the Coast Guard."). The SAR Addendum itself provides that "Coast Guard personnel are expected to exercise broad discretion in performing the functions discussed." U.S. COAST GUARD, U.S. COAST GUARD ADDENDUM TO THE NATIONAL SEARCH AND RESCUE SUPPLEMENT 2 (2013). Indeed, the Coast Guard's discretion in how to conduct a search and rescue operation is prescribed by statute. See Thames Shipyard, 350 F.3d at 256 (citing 14 U.S.C. § 88). The decision

to render assistance is discretionary. <u>Fondow v. United States</u>, 112 F. Supp. 2d 119, 129 (D. Mass. 2000).

Plaintiffs argue that a finding of "distress" was mandatory on the morning of December 3 when the Orin C reported it was "dead in the water." But the SAR Addendum notes that "being disabled on the water" is not always "classified as DISTRESS." Dkt. 88-19 at 7. The SAR Addendum recognizes that, in the case of a disabled vessel, "there <u>may</u> still be a real concern for safety in the mind of the [Mission Coordinator] or the mariner" and "<u>permits</u> more expeditious response in those cases where the mariner expresses apprehension for the near-term safety of vessel's occupants." <u>Id.</u> (emphases added). Thus, the distress classification of a disabled vessel involves "an element of judgment or choice." <u>Berkowitz</u>, 486 U.S. at 536.

Plaintiffs also highlight that the Coast Guard knew the tow was defective because the Communications Unit Controller at Station Gloucester "overheard the tow break a few times as well as problems with avoiding waves and the worsening weather." Dkt. 102-6 at 2. However, even if the Orin C should have been classified as "in distress" earlier, the Coast Guard maintains discretion in how to respond. The SAR Addendum provides that "[i]mmediate response shall be initiated, <u>if feasible</u>, to any known situation in which [a] mariner is in imminent danger." Dkt. 88-19 at 7 (emphasis added). It continues that the

"response may be provided by regular Coast Guard; Coast Guard
Auxiliary; or other federal, private, state, local, or
commercial entity resources." Id. (emphasis added). Even if the
Orin C were "in distress" before the rogue wave hit at 2:47 PM,
Coast Guard policy permitted it to rely on the Foxy Lady, a
private vessel, to respond.

Plaintiffs rely heavily on testimony from the Coast Guard's
30(b)(6) deponent, Brian Fleming, who participated in the rescue
and has years of experience, that Coast Guard policy is to
immediately render assistance when a vessel is "in distress."
Dkt. 102-4 at 7. Fleming testified that when the Coast Guard
"receive[s] an internationally recognized distress signal,
you're in distress, you launch[.]" Id. Fleming explained that
decisions about when to launch assets are not made using a
"numerical" or "objective" standard, but are rather based on "a
reasonable and prudent person looking at the situation and
making a decision . . . as a team." Id. Fleming laid out the
variety of options available to the Coast Guard when the SAR
Addendum factors indicate that a vessel is not in "non-
distress." Id. at 6. For example, the Coast Guard could put the
vessel "on a communications schedule" and continue to seek
assistance from private ships through a marine broadcast. Id. If
the situation is more severe, the Coast Guard "has the authority
to launch" assets, either to gather more information or to

undertake a rescue. Id. at 7 (emphasis added). This decision-making flexibility shows that the response to a distress determination is not mandatory, but instead "is a matter of choice for the acting employee." Berkovitz, 486 U.S. at 536.

At the second step of the discretionary function analysis, the court must consider whether the Coast Guard's judgment about when to initiate the rescue, as informed by its distress level classification, was "based on considerations of public policy." See id. at 537. In Thames Shipyard, the First Circuit determined that the Coast Guard's decision about when to intervene "involve[s] the balancing of incommensurable values — such as human safety, protection of property, autonomy, and the allocation of resources — typically associated with policy decisions." 350 F.3d at 256-57. In that case, a vessel was rapidly taking on water, but the captain and two members of the crew wanted to remain on board and explore options short of evacuation, such as commercial salvage. Id. at 250. The Coast Guard forcibly evacuated the vessel out of fear that continuing flooding would make rescue impossible. The First Circuit held that the Coast Guard's decision about when to evacuate fell within the discretionary function exception because "the Coast Guard has statutorily-granted discretion to exercise its judgment in determining how it goes about search and rescue" operations and "the determination that the peril to the

endangered seamen had reached such a level as to require a forced evacuation involved a true policy choice." Id. at 256.

Based on the undisputed facts in the record, the Court concludes that the discretionary function exception applies here. At the time the Foxy Lady radioed the Coast Guard, the Foxy Lady was closer to the Orin C than Station Gloucester, which was the closest Coast Guard response facility. Station Gloucester has only two 47-foot motor lifeboats to respond to the geographic area from Essex, MA to Nahant, MA. The Coast Guard had to consider how best to deploy its resources in light of the known threat level, impending gale conditions, the intended tow by the Foxy Lady, no reports of injuries and the statements of the captains of the Orin C and the Foxy Lady prior to the rogue wave that did not support a distress situation.

Plaintiffs argue that even the Coast Guard's own personnel believed an earlier intervention was warranted. Plaintiffs cite a report by Andrew Wahlund, who was monitoring communications from Station Gloucester, that he "felt that the Coast Guard should have gotten an asset underway earlier based on the weather forecast." Dkt. 102-6 at 3. But that record evidence does not establish that the Coast Guard's decision was either mandatory or not informed by policy. It goes instead to the merits of Plaintiffs' negligence claim. Because the United States has not waived its sovereign immunity on this claim, the

Court cannot properly consider Plaintiffs' arguments on the merits.

### 2. Failure to Launch Helicopter

Plaintiffs contend the Coast Guard breached its duty of care by failing to deploy a helicopter earlier, in violation of an internal Coast Guard policy. Plaintiffs argue a helicopter should have been deployed as soon as the Orin C began to take on water at 2:47 PM. Plaintiffs can point to no statute, regulation, or written internal policy that makes deployment of a helicopter mandatory under particular circumstances. Fleming testified that "[w]hen you have a vessel that's taking on water or you have a report of a person who's already in the water, we always send a helo because they rescue people in the water." Dkt. 88-9 at 39. Read in context, Fleming's testimony about the Coast Guard's practice does not make the decision a mandatory one in all circumstances.

Rather, as Fleming explained, a single Coast Guard rescue helicopter is responsible for the territory extending from Canada to New Jersey. Fleming described the process of obtaining that helicopter:

> [W]e would request a helo through the first Coast Guard District. . . . District would decide, do they have a higher level mission that that helo is needed on or it's already on. For example . . . There's six people who are known to be in the water in Long Island Sound . . . versus people, three people on a boat that may [or] may not be taking on water that would cause it to sink. So District

would have to do that. . . . They're responsible for the
availability of assets. Then the pilot at the Air Station,
he or she would have to determine, based on your briefing
to me, is this a mission that we can accomplish.

Dkt. 88-9 at 40.

With twenty-twenty hindsight, one could disagree with the
decision not to launch the helicopter sooner, as soon as the men
were ordered to leave the ship and enter the water.[3] However,
this decision about how and when to assign the helicopter falls
squarely within the discretionary function exception.

### V.   **Conclusion**

The Court holds that the United States is entitled to
sovereign immunity and allows its motion to dismiss for lack of
subject matter jurisdiction.

### **POWELL'S MOTION FOR SUMMARY JUDGMENT**

### I.   **Good Samaritan Doctrine**

Powell argues that under the Good Samaritan doctrine, he
did not breach any duty to the Orin C as a matter of law.

"[T]he Good Samaritan rule . . . makes one person liable to
another for breach of a duty voluntarily assumed by affirmative
conduct, even when that assumption of duty is gratuitous."

---

[3] Even if not within the discretionary function exemption, the
Good Samaritan Rule would apply. See Rodrigue v. United States,
968 F.2d 1430, 1434-35 (1st Cir. 1992) (rejecting claim that Air
Force violated Good Samaritan Rule when it negligently waited
hours to send a helicopter to rescue a drowning swimmer because
there was no evidence the negligence worsened his position).

Thames Shipyard, 350 F.3d at 261 (citation omitted). The First Circuit has adopted the Second Restatement of Torts' articulation of the doctrine:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Id. (quoting Restatement (Second) of Torts § 323).

The Second Restatement thus lays out two ways a Good Samaritan can be liable for negligence: increased risk of harm and detrimental reliance. Fondow, 112 F. Supp. 2d at 130. Only "negligent increased risk of harm" has been argued here in relation to Powell's motion for summary judgment. Under that doctrine, "the test is not whether the risk was increased over what it would have been if the defendant had not been negligent, but rather whether the risk was increased over what it would have been had the defendant not engaged in the undertaking at all." Thames Shipyard, 350 F.3d at 261 (cleaned up).

Powell launches a wave of arguments to support his entitlement to summary judgment under this test. In short, Powell argues that (1) the towline was not inadequate because line length is not determinative of a safe tow; (2) even if the towline was too short, there is no evidence it caused the Orin C

to sink; (3) even if damage was sustained during the rogue wave, that event was an Act of God for which the Foxy Lady cannot be held responsible; and (4) the Orin C was left better off than it would have been absent the Foxy Lady's rescue.

Plaintiffs respond that the Foxy Lady negligently increased the risk of harm to the Orin C and its crew by using an inappropriate tow line, which resulted in damage to the Orin C so that it took on water and eventually sank. Plaintiffs argue Powell either should not have undertaken the rescue at all or should have sought Coast Guard assistance earlier.

Genuine disputes of material fact remain as to each party's arguments, precluding summary judgment.

**1. Adequacy of Tow Line**

Powell argues there was nothing negligent about his tow of the Orin C, so it could not possibly have negligently increased the risk of harm to the Orin C. As evidence, Powell points to testimony from his expert, Peter Mahoney, that any issues with the towline were due to the Orin C's unprotected bow, not the rope or the Foxy Lady's tow. This evidence goes only to why the towline broke and not to whether there was enough line, which is the crux of Plaintiffs' theory of negligence.

Powell also cites deposition testimony from Brian Fleming, the Coast Guard's 30(b)(6) deponent, that "[y]ou can have a very short tow and be in step." Dkt. 86-28 at 2. But the continuation

of Fleming's testimony shows that the towline length <u>could</u> have affected the safety of the Foxy Lady's tow. Fleming explained that the length of the line is "a factor . . . only to the point where you adjust the length of the towline. . . . where the length comes into play is . . . we'll let more out until it's in step." <u>Id.</u>

Plaintiffs contend that the Foxy Lady's tow line was too short and that, as a result, the vessels were not "in step." Because the vessels were out of step, Plaintiffs assert, the Orin C was pulled through waves, including the rogue wave at 2:47 PM. Testimony from crew members on both vessels lend support to this allegation. Plaintiff Lane testified that "the line was really short, so it was kind of beating us up, beating the boat up. It was dragging us through the waves." Dkt. 104-2 at 7. Plaintiff Palmer similarly reported that "[t]hey were being towed on a short line and the boat was being overcome by the seas[.]" Dkt No. 86-24 at 4. Jesse Grissom, a crewmember of the Foxy Lady, said the Orin C "punch[ed] right through the whole [rogue] wave." Dkt. 104-4 at 3. Plaintiffs' expert also wrote in his report that the length and material of the Foxy Lady's towline was "not suitable for the sea and wind condition." Dkt. 104-1 at 9.[4]

---

[4] Powell challenges the qualifications of Plaintiffs' expert, Thomas Ciarametaro, but has not filed a <u>Daubert</u> motion.

There are disputed issues of fact as to whether the Foxy Lady negligently used a towline that was too short or otherwise inadequate under the circumstances.

### 2. Causation

Powell argues that even if there was a faulty tow, there is no evidence it caused the Orin C to sink. As to the source of the water that sunk the Orin C, Powell argues that "no person knows where, why, when or how water entered the Orin C with sufficient volume and speed to sink the boat." Dkt. 86 at 17. Powell notes that he, Lane, and the Coast Guard officer in charge of the scene all testified that they did not see an "incursion source." Dkt. 86 at 18.

But Lane also testified that he heard and saw water "running under the floor" and that the crew determined based on the continually rising water level that the rogue wave had "damaged the . . . boat, the hull." Dkt. 104-2 at 7. Palmer reported that when the rogue wave hit, there was a "loud . . . snap" and he thought the boat had come "unglued." Dkt No. 86-24 at 4. A reasonable juror could credit the crew's determination that the wave caused damage to the hull, even if no one saw the actual site of the damage. Evidence in the record, when viewed in Plaintiffs' favor, supports their theory that the impact of the rogue wave caused damage to the Orin C's hull, due to or at least worsened by the fact that the ships were "out of step."

Powell also points to evidence about the condition of the Orin C before the December 2015 trip, including evidence that an insurer considered it too risky to insure and that it had sustained damage in two prior incidents. There is a disputed issue of fact concerning whether the boat's prior condition was the proximate cause of the Orin C's sinking.

### 3. Act of God

Powell contends that, even if the rogue wave caused fatal damage to the boat, the rogue wave was "a phenomena that invokes an 'Act of God' defense because of its inherent unforeseeability and resistance to human intervention." Dkt. 86 at 18. Plaintiffs' expert has posited that the effect of the wave could have been minimized if the boats were "in step." At this stage, the Foxy Lady's contribution to the alleged damage sustained by the Orin C is a genuine dispute of material fact.

### 4. Orin C's Position Before and After Aid

Powell urges the Court to look at the position in which Powell left the Orin C versus the position in which he found it. He argues that, after the Foxy Lady's tow, the Orin C was closer to shore and was delivered to expert rescuers with the Coast Guard and so was better off than if the Foxy Lady had left it blowing out to sea. Powell is correct that the Good Samaritan test compares the position the plaintiff was in with the

rescuer's aid versus the plaintiff's position <u>without</u> the aid. <u>See</u> <u>Thames Shipyard</u>, 350 F.3d at 261.

When the evidence is viewed in the light most favorable to Plaintiffs, the correct comparison points at this stage are the Orin C being (A) adrift at sea but structurally sound versus (B) towed closer to shore but with damage to the hull. There are disputed issues of fact as to which of those positions is worse.

In sum, the Court agrees with Plaintiffs. The actions of the Foxy Lady are admirable. When asked for help, Powell steamed away from home to help mariners in trouble. Nonetheless, the Court must apply the Good Samaritan doctrine. There are genuine disputes of fact as to whether the Orin C suffered damage <u>during</u> and <u>because of</u> the Foxy Lady's tow. Grants of summary judgment in negligence cases are "rare birds" so Powell and the Foxy Lady must bear this albatross. <u>See</u> <u>Candelario Del Moral v. UBS Fin.</u> <u>Servs. Inc. of P.R.</u>, 699 F.3d 93, 100 (1st Cir. 2012).

## II.  **Termination of Duty**

Powell also argues that his duty to the Orin C terminated when the Coast Guard took over the tow of the Orin C. He cites Restatement (Second) Torts, § 452 (2), for the proposition that "[w]here, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is

a superseding cause." Dkt. 86 at 12. He argues that upon
transferring the tow of the Orin C to the Coast Guard, the Foxy
Lady's duty terminated such that liability cannot attach. While
responsibility for harm did shift to the Coast Guard when it
took charge, Section 452 is inapplicable because Plaintiffs
allege that the Foxy Lady's negligence caused damage to the hull
of the vessel by faulty towing before the arrival of the Coast
Guard. The cases the defendant relies on are not on point. See
Kent v. Commonwealth, 771 N.E.2d 770, 777-78 (Mass.
2002)(dismissing negligence claims where decision of Parole
Board to release violent prisoner on deportation warrant
predated harm to plaintiff by eight years); Wu v. Sorenson, 440
F. Supp. 2d 1054, 1062-64 (D. Mass. 2006) (holding that duty to
an injured student shifted from fellow student to golf
instructor based on supervisory relationship). To the extent the
Foxy Lady is arguing that negligence by the Coast Guard is a
superseding cause of the harm to the Orin C, the record contains
disputed issues of material fact on the cause of the sinking.

## ORDER

The United States' motion to dismiss (Dkt. No. 88) is
**ALLOWED**. The motion by Powell and the Foxy Lady for summary
judgment (Dkt. No. 85) is **DENIED**.

The case is scheduled for a **JURY TRIAL** commencing on **July
13, 2020** at **9:00 am** and a **PRETRIAL CONFERENCE** on **June 17, 2020**

at **2:00 pm** in Courtroom #19, 7th Floor, John Joseph Moakley

United States Courthouse, Boston, MA.


SO ORDERED.


/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge