**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| RICHARD LANE, RICHARD PALMER, | ) | |
| and LEA SUTHERLAND-DOANE, | ) | |
| as ADMIN. ESTATE OF DAVID SUTHERLAND, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 1:17-CV-12356-PBS |
| | ) | |
| PHILIP POWELL, and F/V FOXY LADY, | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO ENFORCE**
**SETTLEMENT AGREEMENT AND ISSUE ORDER OF DISMISSAL**

**Preliminary Statement**

Following a few email exchanges, this case was settled by all parties earlier this month

with an agreement for Defendants to pay Plaintiffs money in exchange for dismissal of the

litigation.  There was not much else to the deal.  Defendants acceded to Plaintiffs' position

that the settlement should not include a confidentiality requirement.  Plaintiffs agreed to

release Defendants' insurer from their G.L. c. 93A/176D bad faith allegations. All of the

essential, material terms were agreed on.  Plaintiffs' counsel provided his law firm's W-9 tax

form, and the settlement checks were obtained from the Bermuda insurer.

And then Plaintiffs' counsel decided that he wanted a release from future claims to

protect himself and his 'expert' witness, the Gloucester harbormaster, whose job may be in

jeopardy because his boss, the city's mayor, apparently does not appreciate his taste in

moonlighting jobs.  (See Exhibit A – Affidavit of Counsel.)

**Introduction**

Defendants Philip Powell and his commercial fishing vessel Foxy Lady ("Powell") have

1

vigorously argued in this action that Powell does not bear fault for the sinking of the F/V Orin C on December 3, 2015, and resulting death of Captain David Sutherland or alleged injuries to crewmen Richard Lane and Richard Palmer.  Powell is a good Samaritan who tried his best to save the old wooden boat, its captain and crew.

Nonetheless, with shrinking insurance coverage and the remote chance that a factfinder (according to this Court) *could* find for Plaintiffs, Powell and his insurer decided to make an offer of settlement to Plaintiffs in exchange for dismissal of the action.  Plaintiffs did not want to be stifled by a confidentiality clause that would prevent them (or their attorney) from talking about the settlement.  To get the deal done, Powell reluctantly agreed.  As is the case with virtually all such agreements, Powell's insurer wanted a release of Plaintiffs' alleged G.L. c.93A/176D bad faith insurance claims handling allegations. Plaintiffs agreed.  The case was over, the deal was done.

But, belatedly, Plaintiffs' counsel, Joseph M. Orlando, Jr. ("Attorney Orlando") had other ideas.  He saw the settlement of his clients claims as an opportunity to extract a little something extra from the deal.  Concerned about his baseless allegations that Powell had committed a felony by conspiring with the mayor of Gloucester to prevent the city's harbormaster from testifying in the case – blatantly false charges that arguably expose Attorney Orlando to a libel claim – and apparently concerned about the harbormaster's job, Attorney Orlando now demanded that he and the harbormaster be included in the releases. He also made other specific demands designed to protect him and the harbormaster even after the undersigned revised initially proposed releases to make them mutual so that Orlando's *clients* had as much immunity from future litigation as Powell.  (Ex. A.)

## Facts

After a few weeks of wrangling by email, mostly about the amount of money left available for settlement in the Defense-Within-Limits ("DWL") policy,[1] the undersigned wrote and sent the following email to Attorney Orlando on Tuesday morning, May 12, 2020:[2]

Joe,
I've got $120,000 for all claims and nowhere else to go for more.  If you want to discuss, I'll be back in the office by 1:30 or so.
Kevin

The next day, Attorney Orlando replied as follows:

Kevin:
Just to keep you in the loop, I've made contact with two of the three Plaintiffs. I am scheduled to speak to the third Plaintiff tomorrow and I'll have hopefully have a response to you by Friday.
Regards,

Attorney Orlando did not need until Friday because on Thursday, May 14th, he replied as follows (highlight added):

Kevin:
$120,000 is accepted. Palmer accepts $10,000. Lane accepts $10,000. The estate accepts $100,000. The releases will include the 93A case, but no confidentiality.
Regards

The undersigned replied twelve minutes later as follows:

Joe,
Excellent, that's great.  I'll order the checks.  You should be on them with the clients I assume?  I'll draft releases and get them to you.  Let me know what you want to do with the court – a Notice of Settlement followed by Stip of Dismissal?
Kevin

Orlando replied later that afternoon as follows:

---

**1**. Mr. Powell is afforded coverage under a typical Protection & Indemnity policy that has limits of $300,000 per incident and which is reduced by the costs of legal defense fees and expenses – a so-called vanishing limit or defense-within-limit policy.  After the Court denied Powell's motion for summary judgment in March, the undersigned decided to halt billing on the file as of late February and work for free to maximize the amount of money available for settlement, contingent on the case actually settling.  In other words, defending at trial would necessitate resumption of billing.

**2.**  The $120,000 offer came on the heels of a $105,000 offer that Orlando would not confirm or deny as rejected, but Defendants nonetheless decided to bid against themselves in a bend-over-backwards attempt to resolve the matter.

**Send to me what you propose and I'll review.**

(See Exhibit B – Settlement Emails, 5/12-14.)

On May 15th, the undersigned sent Orlando three standard draft releases to review – the releases were to be signed by Attorney Orlando's clients only, as a mutual settlement agreement signed by Powell or his insurer or any other person or entity had not been discussed or anticipated. On Monday, May 18th, the undersigned requested that Attorney Orlando send back his firm's W-9 tax form, which he did the same day. (Ex. A.)

On Tuesday morning, May 19th, the undersigned sent Attorney Orlando by email a proposed "Notice of Settlement" that was designed to obviate the need for the motion hearings scheduled for May 27th. (Ex. A.)

Later that day, Attorney Orlando replied by email as follows (highlight added):

**Kevin:**
**==The content of the releases that sent to me for my clients to sign looks fine==, but it will take me some time to get them all signed given the geographic logistics (mostly with Palmer). ==We have a remaining problem, however before my clients can sign the releases and that is the claims that were threatened against my clients and me, as well as the ongoing activity of Sooky Sawyer.== One thing I'd like to avoid is further litigation (something I'm sure we can all agree on), ==so I'm drawing up a release== that I'd like Mr. Powell and MLA/MLA Fisheries Services Corp./MLA non-profit reps to sign, as well. I'll get it over to you by tomorrow for your review.**
**Regards,**

The undersigned replied as follows:

**Joe,**
**Given the history here, I am not surprised that you'd like some guarantees going forward but it doesn't work that way. The deal is done. Your clients brought claims. They are being paid to release them. End of story. We all should move forward and assume whatever risk comes our way for our individual conduct. I could say the same thing about looking to get released by certain people (not that I think there are legitimate claims out there, but we all recognize others are unhappy.) It doesn't work that way. We don't get to leverage the case for our own security. By proposing new elements to an already done deal you are putting your clients' settlements at risk.**

**Kevin**

(See Exhibit C – Post-Settlement Emails, 5/19.)

Attorney Orlando replied by email that "it is obvious that your client and the MLA/affiliates plan on bringing claims against our clients, witnesses, and this office." He indicated that "continued settlement talks . . . hinge on a total resolution of all claims, both pending and planned." (See Exhibit D – Emails, 5/20.)

The undersigned replied that Attorney Orlando "never once conditioned settlement of your clients' claims on a release of claims potentially held by Mr. Powell or anybody else against you, your office or witnesses. Nor would that have been ethically appropriate (or even legal?) I would respectfully request that you provide the basis for the 'obvious' statement you made below and which I have highlighted. I ask this because it is news to me and must be news to you this week since you did not make them conditions to the settlement reached last week." (Ex. D.)

The undersigned and Attorney Orlando then traded drafts of release agreements.

The undersigned's proposal was framed as a mutual release that equally protected Plaintiffs and Defendants in connection with the rescue at sea and resulting litigation. As a memorialization of the deal already struck, it released Defendants' insurer of any bad faith claims, and contained no requirement to keep its terms secret and confidential. (See Exhibit E – Gillis Release Proposal.)

Attorney Orlando's proposal was not a mere memorialization of the agreement already reached. One of the stated purposes of his release was to immunize himself and the harbormaster from "any claims of any sort made by Defendant, through counsel during the course of this litigation as to the Plaintiffs, the Plaintiffs' expert witnesses, and/or

5

Plaintiffs' counsel."   Attorney Orlando's release also demanded that a particular person, Arthur Sawyer, sign on behalf of the insurer, which is simply an attempt to buttress Attorney Orlando's baseless theory that this individual was part of the conspiracy with the mayor to threaten the harbormaster's job if he insisted on testifying as an expert in the matter. (See Exhibit F – Orlando Release Proposal.)

**Standard of Law**

It is a well settled principle of law that an agreement is enforceable as a contract when it contains all material terms and the parties intend to be bound by it.  <u>McCarthy v. Tobin</u>, 429 Mass. 84, 87, (1999); <u>Situation Mgmt. Sys., Inc. v. Malouf, Inc.</u>, 430 Mass. 875, 878 (2000).

Massachusetts courts have found preliminary writings to be incomplete and nonbinding in circumstances in which essential terms remained unresolved or in which the participants visibly reserved their commitment for the later documents.  <u>Targus Group Intern, Inc. v. Sherman</u>, 76 Mass. App. Ct. 421, 429 (2010).  "If, however, the parties have agreed upon all material terms, it may be inferred that the purpose of a final document which the parties agreed to execute is to serve as a polished memorandum of an already binding contract." <u>Goren v. Royalty Investments, Inc.</u>, 25 Mass. App. Ct. 137, 140 (1987) (finding an agreement enforceable because the parties resolved all significant economic issues and voiced no dispute regarding subsidiary terms during the negotiations).

Moreover, even though subsidiary matters may sometimes be the subject of bargaining, norms exist for their customary resolution and a dispute over these terms will not necessarily bar enforcement of an agreement.  <u>Id</u>. at 141.  In <u>Goren</u>, the court stated that a preliminary agreement for purchase and sale of property was binding where the transaction was not "particularly complex" and the parties had agreed upon all material terms.  <u>Id</u>. at 139.

In <u>Basis Technology Corp. v. Amazon.Com, Inc.</u>, 71 Mass. App. Ct. 29 (2008), a case centered on an email exchange between counsel that resulted in a binding settlement, the trial judge found and the Appeals Court affirmed that Amazon's "post hoc" objections to the agreement were simply a result of the email settlement terms finally landing on the desk of a senior executive who did not like a few of the subsidiary terms.  The court labeled Amazon's actions as a "change of mind" and merely an attempt to "renounce its genuine original intent" by "seeking an escape hatch" from the main agreement by puffing up the importance of a subsidiary term in the agreement.  <u>Id</u>. at 41.

In <u>Fecteau Benefits Group, Inc. v. Knox</u>, 72 Mass. App. Ct. 204 (2008), an exchange of emails between opposing counsel constituted a binding agreement that the prevailing party would be entitled to attorneys' fees, even though the lawyer for the non-prevailing party stated in one of the emails that the terms needed to be reduced to a formal settlement document.

The Appeals Court agreed that the trial court judge was correct when he found that the parties clearly intended to be bound by the terms set forth in the email exchange and that language calling for the terms to be reduced to a formal writing was simply an attempt to "memorialize" the terms and not a pre-condition to the agreement.

In <u>Hansen v. Rhode Island's Only 24 Hour Truck & Auto Plaza Inc.</u>, 962 F.Supp.2d 311 (D. Mass. 2013) the court held that an informal email exchange between the opposing parties was sufficient to constitute a binding settlement agreement. A receiver had been appointed for the defendant business after the email exchange and tried to back out of the deal before the agreement could be memorialized in a formal document.

In <u>Hansen</u>, Judge Nathaniel Gorton wrote that "in this case it is manifest from the email exchange that the parties entered into a valid settlement agreement. The parties had agreed on all the material terms, including the distribution of $235,000 to plaintiff and $15,000 to defendants, 'mutual releases from all parties' and 'dismissal of the pending action with prejudice and without costs.' Both parties clearly expressed mutual assent to the terms when plaintiff's counsel wrote that 'Eric Hansen will accept Defendants' settlement offer' and defendants' counsel responded, 'Glad we were able to get it done.'"

Judge Gorton concluded that although the parties continued to attempt to formalize the agreement through a signed settlement document, "the parties were proceeding to 'memorialize' … the settlement terms, not to create them,'" quoting <u>Basis Technology Corp. v. Amazon.com, Inc.</u> at 37.

### Argument

This case is on all fours with <u>Basis Technology</u>, <u>Hansen</u>, <u>Fecteau</u> and others in Massachusetts that hold that an email exchange can readily spell out the essential terms of a deal, demonstrate the parties' present intents to be bound, and serve as the basis of a settlement agreement.  The releases and other matters that attorneys typically employ to close out a case are many times, as here, simply a memorialization of the deal already struck, and do not represent the introduction of new conditions and terms.

Here, quite plainly, the parties reached a straightforward deal on May 14th.  The most important part, the money offered, was finally enough to entice a "yes," an acceptance from all three Plaintiffs.  What did Defendants buy for that money?  A dismissal of the case, of course.  This is not rocket science – or even the resolution of a complex patent infringement or software licensing case.  The email series (the ones reproduced here and others) always

8

conditioned settlement on Plaintiffs releasing their bad faith allegations against Powell's insurer.  One would be hard-pressed to find any bodily injury or wrongful death settlement with an insurer that does not include a similar release, whether the claims were ever asserted or not.  Finally, for some reason, Plaintiffs insisted, and Powell and his insurer relented, on no confidentiality clause in the agreement because, apparently, they wanted the freedom to speak about the settlement.

On May 14th a deal was reached.  Over the weekend, from May 15-18, after news of the case splashed on social media and other places, including withering, scornful criticism of Attorney Orlando, things changed.  Now, Plaintiffs' counsel, who had achieved a substantial settlement of dubious claims for his clients, and protection for them against future claims by Powell and his insurer, wanted something else.  By May 19th he was clearly working not solely for his clients' interests but for what he perceives as his own best interests and those of his cohort, the Gloucester harbormaster.

## Conclusion

**This Court must restore some measure of integrity to a case that is out of control.**

First, without a shred of evidence other than his own speculation, Plaintiffs' counsel moves for sanctions against Defendant for alleged criminal conduct, even going so far, again, without any measure of proof, to request that this Court refer the matter to the Department of Justice.

Next, Powell and his insurer settle the case with a mutual release, dismissal and payment of money – and yet Attorney Orlando tries to game the system to extract a release designed to protect and immunize himself and his 'expert' from claims, if any, arising from his disgraceful conduct in the litigation.

9

The Court needs to enforce the settlement agreement and enter an order of dismissal of the case with prejudice, without costs, and with all rights of appeal forever waived.


Defendants, Philip Powell and
F/V Foxy Lady,
By their Attorney,

/s/ Kevin F. Gillis

_____
Kevin F. Gillis, Esq. [BBO No.: 567133]
The Law Office of Kevin F. Gillis, Esq.
27 Algonquin Road
Canton, MA 02021-1232
kgillis@subrogationattorney.com
781-326-1112                                      Dated:  May 26, 2020

---

### *Certificate of Service*

I, Kevin F. Gillis, Esq., hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to counsel for each party on May 26, 2020.

/s/ Kevin F. Gillis

Kevin F. Gillis, Esq.